JACOB R. GLICKMAN,

       Plaintiff,

     v.

VILLAGE OF MORTON GROVE, et al.,

       Defendants.

No. 18 CV 4931

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Plaintiff Jacob R. Glickman alleges that he was mistreated at the hands of two police officers from the Village of Morton Grove. Whether he is right depends in part on what he was up to before they arrived and what the officers knew about it. Since this is a motion to dismiss, Glickman's version of the story controls whether he can state a claim for violations of his constitutional and state-law rights. But Glickman has told this same story elsewhere—including in another complaint he recently filed involving this same set of events—and that complaint contains details that are absent here. Those details matter.

## I.    Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, although a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, the court need not do the same for legal conclusions or "threadbare recitals" supported by only

"conclusory statements." *Id.* at 680–82. The plaintiff must provide "more than labels" or "a formulaic recitation of a cause of action's elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562.

## II.   Facts

For roughly ten days during the summer of 2017, Glickman and his dog interacted with personnel from a camp that the Maine-Niles Association of Special Recreation ran in Austin Park. [25-2] ¶¶ 21–22.[1] Eventually, staff members from the camp called their program manager, who called the police department to complain about Glickman "with the intent of having [him] removed" from the park. [7] ¶ 21; [25-2] ¶ 25. When Officers Atto and Walsh from the Village of Morton Grove arrived on scene, a staff member from the camp told them that Glickman had been "acting suspiciously for one and one-half weeks." [25-2] ¶ 27.

Officers Atto and Walsh then approached Glickman. [7] ¶ 23. They stood on either side of him to the point where he could not move, [7] ¶ 24, and then harassed him, making him so concerned and apprehensive that he felt compelled to leave as soon as Atto and Walsh backed-off and let him go. [7] ¶ 25.

---

[1] Bracketed numbers refer to entries on the district court docket. The facts are taken from the second amended complaint, [7], and documents that defendants submitted with their motion to dismiss that I have judicially noticed, including the complaint that Glickman filed in this court (the United States District Court for the Northern District of Illinois) against the Maine-Niles Association of Special Recreation. *See* [25-2]; *Glickman v. Maine-Niles Association of Special Recreation et al.*, No. 18-cv-04907 (N.D. Ill. July 23, 2018) ECF No. 6. *See also infra*, § III.A.

With Glickman on his way, Atto and Walsh circled back to the Maine-Niles staff members, who told them that Glickman had been taking pictures in the direction of two girls. [25-2] ¶ 28. Atto and Walsh left again and caught up to Glickman outside his house. [7] ¶ 27. They accosted him and then continued to interrogate him while demanding to see his cell phone. *Id.* Glickman asked if he was under arrest. [7] ¶ 28. When they told him he was not, Glickman said he felt that Officers Atto and Walsh were harassing him and that he was going to police headquarters to file a complaint. *Id.* He then declined to answer any more questions without his attorney and walked into his residence. *Id.*

Later that same day, Walsh went back to Austin Park and checked in again with Maine-Niles staff. [25-2] ¶ 29.[2] It was at this point that they gave him the blow-by-blow. At first, they told Glickman to keep his distance from the campers. *Id.* ¶ 29(a). A few days later, they observed a camper who was separated from the group holding Glickman's puppy, and again distanced Glickman from the campers. *Id.* ¶ 29(b). Then, Glickman attempted to stop one camper as the camper ran past him, and started approaching other campers, calling them by name and asking camp staff about the campers and their medical conditions. *Id.* ¶ 29(c)–(d). Finally, on the morning the camp staff called the police, Glickman initiated a conversation with them and "was 'confronted' by" a Maine-Niles staff member. [25-2] ¶ 29(e).

---

[2] The complaint in Glickman's case against Maine-Niles does not clarify whether this conversation took place before or after Atto's and Walsh's encounter with Glickman outside of his house. *See* [25-2] ¶ 29. But since it is reasonable to infer that this conversation took place after that encounter, and since that inference would be more favorable to Glickman's claims, I assume that it did.

The day's events continued when Glickman appeared at Morton Grove's police headquarters and requested to speak with the ranking officer. [7] ¶ 30. While he was waiting in the lobby of the station house, Atto and Walsh arrested him for disorderly conduct. [7] ¶¶ 31–32. They never placed Glickman in a cell, but they did handcuff him, make him remove his shoelaces, and issue him two summonses related to his puppy (Glickman alleges both were baseless) before forcing him to leave through a garage door into the garage area. [7] ¶¶ 32, 34–37. He was not given the chance to retrieve his shoelaces. [7] ¶ 37. Glickman alleges that Atto and Walsh then caused false information to be sent out on the police blotter. [7] ¶ 38.

The disorderly conduct charge was eventually dismissed because the information on the criminal complaint failed to show that Glickman's conduct had breached the peace. [7] ¶ 39.

## III. Analysis

### A. Facts Considered

Normally, a court must convert a motion to dismiss to one for summary judgment if it considers matters "outside the pleadings." Fed. R. Civ. P. 12(d). There are two pertinent exceptions. First, when opposing a Rule 12(b)(6) motion, a plaintiff "may submit materials outside the pleadings to illustrate the facts the [plaintiff] expects to be able to prove," so long as those "new elaborations" are consistent with the complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

Second, a court may consider judicially noticed facts. *Papasan v. Allain*, 478 U.S. 265, 269 n.1 (1986); *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

4

Facts that may be judicially noticed include those that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Such sources can include "documents contained in the public record," *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), and filings in other federal cases, so long as they are also made a part of the record in the instant case. *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 676 n.2 (7th Cir. 2009); *McFields v. Sheriff of Cook Cty.*, No. 17-CV-7424, 2018 WL 1784138, at *1 n.1 (N.D. Ill. Apr. 13, 2018); *Jackson v. Kane Cty.*, No. 09CV-4154, 2010 WL 4719713, at *2 (N.D. Ill. Nov. 9, 2010) (taking judicial notice of facts alleged in plaintiff's state case).

Both exceptions apply, with limitations. The first applies to the documents that Glickman attached to his response to the motion to dismiss, insofar as those documents are consistent with the allegations in the complaint. *See* [30]; [30-1]; [30-2]; [30-3]; [30-4]; *Geinosky*, 675 F.3d at 745 n.1. And for the most part, they are. For instance, the operative complaint says that Atto and Walsh "did not observe" Glickman do anything that would support a finding of probable cause, either while he was in the park, [7] ¶ 6, outside his house, *id.* ¶ 8, or at Morton Grove's police headquarters. *Id.* ¶ 33. That technically comports with the report that the camp program manager filed, [30-3], which describes a series of events that Atto and Walsh did not observe but that were communicated to them by the program manager, who heard about them largely from a staff member on-site. *See id.*

The problem is that the program manager's report undermines Glickman's claims. It tends to suggest that Atto and Walsh knew more about Glickman's activities than Glickman lets on. If Glickman had attached these documents to his complaint, they could be considered and would control. *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). But as attachments to his briefing, they remain "evidence" not properly considered as part of a motion to dismiss—even though he relies on portions of them in his opposition. Accordingly, I have excised them from my recitation of the facts.

The second exception also applies, but again, with limitations. Defendants request that I take judicial notice of six documents, each of which is a public record. *See* [25-2] (complaint in Glickman's other federal lawsuit); [25-3] (the criminal complaint in Glickman's misdemeanor case); [25-4] (Glickman's cash deposit bail bond form); [25-5] (the criminal disposition sheet and transcript from Glickman's proceedings before the Cook County Second Municipal Department); [25-6] (Glickman's post-trial motion); [25-7] (the criminal disposition sheet and transcript from Glickman's post-trial motion proceedings in that same court). Their authenticity has not been challenged, *see* [28], their existence is "not subject to reasonable dispute," and their "accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). I take judicial notice of these documents, but where they conflict with Glickman's allegations, I have credited the operative complaint and ignored the public record. *Tobey v. Chibucos,* 890 F. 3d 634, 648 (7th Cir. 2018).

What's trickier is defendants' request to take judicial notice of the contents of these documents. Of particular import are the allegations in the amended complaint in the lawsuit that Glickman filed against the Maine-Niles camp, *Glickman v. Maine-Niles Association of Special Recreation et al.*, No. 18-cv-04907 (N.D. Ill. July 23, 2018) ECF No. 6. [25-2]. That complaint is the source of facts pertinent to the resolution of this motion. For instance, that is where Glickman alleges that Maine-Niles staff told Atto and Walsh that he had been "acting suspiciously for one and one-half weeks." [25-2] ¶¶ 22, 27. That is also where Glickman alleges that Walsh learned about the other actions Glickman had taken (i.e., that a camper had been separated from the group and was found holding Glickman's dog, that Glickman had "attempted to stop a camper as the camper ran past him," etc.). [25-2] ¶ 29(c)–(d).[3] These facts are absent from Glickman's complaint here. *See* [7].[4] *See also* [30-3] (many of these facts are also contained in the documents that Glickman submitted with, and relied upon in, his opposition to the motion to dismiss).

Although courts "routinely take judicial notice of the actions of other courts or the contents of filings in other courts," "[t]aking judicial notice of the contents of

---

[3] Glickman's other complaint also alleges that the information that the Maine-Niles staff gave to Atto and Walsh was false. *Id.* at ¶ 30. But that allegation is unimportant here because the probable cause determination (discussed below) turns on what Atto and Walsh reasonably believed at the time that they encountered Glickman, not whether the information that substantiated their beliefs was in fact accurate. *Carmichael v. Vill. of Palatine, Ill.,* 605 F.3d 451, 457 (7th Cir. 2010).

[4] If the litigant's "personal observations differ from the public record," I must draw my recitation of the facts "from the well-pleaded allegations of the complaint, however improbable they seem." *Tobey*, 890 F.3d at 639. But here, Glickman's allegations do not differ from the public record so much as they carefully omit facts in the public record that he alleged elsewhere.

hearsay statements in such filings to prove the truth of the matters is much harder to justify." *Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016). *See also Tobey,* 890 F.3d at 648 ("[c]ourt records, like any other documents, may contain erroneous information").

An important difference in Glickman's case, though, is that these are statements he himself made (through his attorney) about the events at issue in this lawsuit. Allegations in a complaint are "binding admissions" that "can of course admit the admitter to the exit from the federal courthouse." *Jackson v. Marion Cty.*, 66 F.3d 151, 153–54 (7th Cir. 1995). And though these are allegations in a complaint from a different case, Glickman has not challenged that complaint's authenticity nor advanced any other argument explaining why judicial notice would be improper. Instead, Glickman says only that defendants "cannot point to any document identifying what [Atto and/or Walsh] knew at the time of the arrest," [28] at 13, a pat reference to his careful draftsmanship. *See also Philips Med. Sys. Int'l, B.V. v. Bruetman*, 982 F.2d 211, 215 (7th Cir. 1992) (there is a "longstanding rule" that courts will "make exceptions" to the rule against judicially noticing new evidence "where the new evidence is of a 'proceeding[ ] in other courts, both within and outside of the federal judicial system,'" so long as "the proceedings have a direct relation to matters at issue"); *United States v. Coonce,* 961 F.2d 1268, 1281 (7th Cir. 1992) (criminal defendant's failure to object to use of judicially-noticed statements resulted in waiver).

I take judicial notice of the allegations in Glickman's complaint in *Glickman v. Maine-Niles Association of Special Recreation et al.*, No. 18-cv-04907 (N.D. Ill. July 23, 2018); [25-2].

## B.  Constitutional Claims

Glickman alleges that Atto and Walsh violated his First, Fourth, Eighth, and Fourteenth Amendment rights, and that 42 U.S.C. § 1983 allows him to sue them personally for their conduct. *See* [7] ¶¶ 40–43.[5] He also alleges that § 1983 provides him with a cause of action against the Village of Morton Grove, which he says violated his First, Fourth, and Fourteenth Amendment rights when it failed to properly train, supervise or discipline Atto and Walsh. [7] ¶ 45. And although it omits reference to § 1983, his third count alleges that these constitutional violations were caused by Morton Grove's "*de facto* policies, practices, [and] customs," invoking *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). [7] ¶¶ 47–51.

In order to state a § 1983 claim, Glickman must allege that each defendant was (1) acting under color of state law when they (2) engaged in conduct that deprived

---

[5] Glickman also alleges a violation of a constitutionally-grounded right to be free from "abuse of process." [7] ¶ 41(d[1]) (there are two subparagraphs that use the letter "d" in the forty-first paragraph of the operative complaint; Glickman's "abuse of process" claim is contained in the first). Atto and Walsh move to dismiss that claim because there is, they argue, no such right in the Constitution. *See* [25] at 14 n.3. At least when Illinois law provides a remedy, I agree. *Flanigan v. Masterson*, No. 15 C 7715, 2016 WL 302129, at *2 (N.D. Ill. Jan. 25, 2016) (abuse of process claims are not allowed under § 1983 when there is an equivalent state law remedy); *Podolsky v. Alma Energy Corp.*, 143 F.3d 364, 372 (7th Cir. 1998) (Illinois law provides a remedy for abuse of process). *See also Adams v. Rotkvich*, 325 Fed. App'x 450, 453 (7th Cir. 2009) ("abuse of process is not a free-standing constitutional tort if state law provides a remedy for abuse of process," and "Illinois provides such a remedy"). Glickman does not object. *See* [28] at 28–29. Glickman's federal abuse of process claim is dismissed with prejudice.

Glickman of the rights, privileges, or immunities secured by the Constitution or laws of the United States, and (3) that their conduct proximately caused the deprivation. *Webb v. City of Chester, Ill.,* 813 F.2d 824, 828 (7th Cir. 1987). Only the second element is at issue here.

### 1.    *Eighth and Fourteenth Amendment*

The Eighth Amendment applies after conviction, *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006); *Villanova v. Abrams,* 972 F.2d 792, 797 (7th Cir.1992), and the Fourteenth applies after a "judicial determination of probable cause, otherwise known as a Gerstein hearing." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). *See also Lester v. City of Chicago,* 830 F.2d 706, 713 (7th Cir. 1987) ("Fourth Amendment standards govern all excessive force in arrest claims"). Glickman's complaint does not allege that any constitutional violation took place after he was convicted of disorderly conduct. *See* [7]; [28]; [25-5] at 6 (he was not convicted until the spring of 2018). His Eighth Amendment claim is dismissed with prejudice. And since it also does not appear from the complaint that Glickman is challenging police conduct that occurred after a judicial determination of probable cause, his claim under the due process clause of the Fourteenth Amendment is dismissed with prejudice, too. *See* [7]; [28].

Glickman's opposition to the motion to dismiss clarifies that his claim is under the equal protection clause of the Fourteenth Amendment, *see* [28] at 12, but even equal protection claims based on a supposed "class of one" require an allegation that "a state actor has intentionally treated [the plaintiff] differently than others similarly

situated," and that "there is no rational basis for the difference in treatment." *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Glickman's complaint makes no mention of any similarly situated comparators. *See* [7]. It does not even explain what kind of discrimination he alleges occurred. *See id.*; [28] at 12. His claim under the equal protection clause of the Fourteenth Amendment is dismissed without prejudice.[6]

### 2. Fourth Amendment

The Fourth Amendment protects against "unreasonable searches and seizures and provides that 'no warrants shall issue, but upon probable cause.'" *United States v. Slone*, 636 F.3d 845, 848 (7th Cir. 2011); U.S. CONST. amend. IV. There is an exception to the warrant requirement that allows officers to "arrest someone outside of the home when they have probable cause to believe that a suspect has committed, is committing, or is about to commit an offense." *Slone,* 636 F.3d at 848. Officers are also allowed to "stop [a] person for a brief time and take additional steps to investigate" (a *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1 (1968)) whenever they have "reasonable suspicion that a person may be involved in criminal activity." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 185 (2004). These are two points on a "continuum in which the necessary degree of confidence increases

---

[6] It may be possible for Glickman to cure the defect in his equal protection claim, so the dismissal is without prejudice. *See Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004) ("[u]nless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss"). For claims that cannot be cured by amendment, because the facts in the complaint and public record demonstrate that amendment would be futile, dismissal is with prejudice.

with the degree of intrusion." *United States v. Burton*, 441 F.3d 509, 512 (7th Cir. 2006) ("a 'stop' without limiting the suspect's freedom requires no suspicion; a brief detention calls for reasonable suspicion; an arrest requires probable cause; invasive techniques such as surgery require more"); *United States v. Chaidez*, 919 F.2d 1193, 1198 (7th Cir. 1990).

Probable cause is a "practical, nontechnical conception." *Illinois v. Gates*, 462 U.S. 213, 231 (1983). It "deal[s] with probabilities" and the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* The reasonableness of the officer's conduct must be judged in relation to the totality of surrounding circumstances, *Thayer v. Chiczewski*, 705 F.3d 237, 247–48 (7th Cir. 2012), not as an "omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard." *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010). "When facts support a 'fair probability' that a suspect has committed a crime, probable cause to arrest exists." *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013).

Probable cause also "depends on the elements of the applicable criminal statute." *Thayer*, 705 F.3d at 247. Atto and Walsh arrested Glickman for disorderly conduct, which Illinois's criminal statutes define as any act done "in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 Ill. Comp. Stat. Ann. 5/26-1. Harassment, threats, and behavior similar to stalking can each qualify. *Reher v. Vivo*, 656 F.3d 772, 777 (7th Cir. 2011).

The "reasonable suspicion" analysis is similar to the probable cause analysis: it cannot be reduced to a "neat set of legal rules," and must take into account the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). "'[R]easonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.*

Whether an officer had probable cause (or reasonable suspicion) can depend on the source of their information. Where that source is a "credible victim or eyewitness," that victim's or eyewitness's report alone can provide the basis for probable cause. *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000); *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007); *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 716 (7th Cir. 2013). The "informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Gates*, 462 U.S. at 230.

In *Reher,* 656 F.3d at 774, officers responded to a call in a public park and arrived on scene to find a group of visibly upset residents. *Id.* at 774. Some of the residents were screaming that a suspect was videotaping their children, and others were making comments about "kids being photographed" and sex offenders. *Id.* One officer (Gabinski) interviewed a witness that identified Reher as the suspect, and then remembered previous allegations that Reher had thrown a rock through an ex-girlfriend's window and distributed nude photographs of her. *Id.* at 774–75. When Reher called Gabinksi a "fucking bitch," a different officer (Vivo) arrested Reher. *Id.*

at 775. Gabinksi had probable cause to arrest Reher for disorderly conduct and, even though Vivo did not have probable cause, Vivo was entitled to qualified immunity. *Id.* at 777. Without Gabinski's additional background knowledge, the "neighbors' allegations were probably a bit too vague to support an arrest for disorderly conduct." *Id.* Had there been an allegation that Reher had been "getting close" to the children, it might have changed the analysis. *Id.* at 777–78.

At least according to Glickman's complaint, by the time Atto and Walsh approached Glickman, the facts they had available to them fell just shy of presenting a "fair probability" that Glickman had disturbed the peace. *Bridewell*, 730 F.3d at 675; 720 Ill. Comp. Stat. Ann. 5/26-1; *Reher*, 656 F.3d at 777. Someone from Maine-Niles had called the police to complain about Glickman's presence in Austin Park. [25-2] ¶ 25. When Officers Atto and Walsh arrived, they found both Glickman and staff members from Maine-Niles nearby. *Id.* ¶ 27; [7] ¶ 23. They spoke with eyewitnesses from Maine-Niles, who told them that Glickman had been "acting suspiciously for one and one-half weeks" prior to their arrival. *See* [25-2] ¶ 27. Even though the crime in question (disorderly conduct) can include behavior that resembles stalking, Atto and Walsh had less reason to believe a crime had been committed than the arresting officer (Vivo) in *Reher*, 656 F.3d at 777. It is plausible that they lacked probable cause.

But according to the complaint, what Atto and Walsh did in Austin Park also falls shy of an arrest, so it required less than probable cause. The complaint alleges an encounter that might even fall short of a *Terry* stop: Glickman says that Atto and

Walsh "bodied up" to him so that he "could not move," [7] ¶ 24, and that Glickman left once they "backed off." [7] ¶ 25. Even drawing all reasonable inferences in Glickman's favor, the detention was brief. It did not involve any searching of Glickman's person or personal effects. And even though a stop that is reasonable at the start can become unlawful if its "manner of execution unreasonably infringes interests protected by the Constitution," *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), the relevant inquiry is whether "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Atto and Walsh's investigation meets this standard: the officers had eyewitness information justifying inquiry into Glickman's presence in the park, and they restrained him briefly to investigate. Based on both of Glickman's complaints, Atto's and Walsh's seizure of Glickman in Austin Park was reasonable, so Glickman's unreasonable seizure claim is dismissed with prejudice.

Glickman's allegation that Atto and Walsh used unreasonable force during their detention is different, but fares no better. Officers may not use "greater force than [is] reasonably necessary to make [an] arrest." *Lester*, 830 F.2d at 713. Although the "right to make an … investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham v. Connor*, 490 U.S. 386, 396 (1989), "[w]hat is reasonable depends upon the particulars of a given case, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively

resisting arrest or attempting to evade arrest by flight.'" *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 2004). *See also United States v. Bigham,* 812 F.2d 943, 949 (5th Cir. 1987) ("[t]echnical batteries, angry words, or passing thumps do not rise to constitutional abuses, [citation omitted], but injuries far shy of disablement suffice to offend"); *Meyer v. Robinson*, 992 F.2d 734, 739 (7th Cir. 1993) ("[w]hile excessive force does not require injury, [citation omitted], no injury gives weight to the assertion of no excessive force"); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (the force used is reasonable only when it is "exercised in proportion to the threat posed").

The allegation that Atto and Walsh pinned Glickman between their bodies is not enough to establish an unreasonable use of force. *See* [7] ¶¶ 24–25. The officers had some information about suspicious activity by Glickman, and briefly stopping him in a manner that caused no physical injury was a reasonable way to dispel their suspicions.[7]

In any event, Atto and Walsh are entitled to qualified immunity. Qualified immunity "protects police officers 'who act in ways they reasonably believe to be lawful.'" *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). There are "two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional

---

[7] Although Atto and Walsh said that they "'put the fear of god in [Glickman]' about interacting again with [the] campers," [30-3] at 3, their underlying intent and motivation is irrelevant. *Cyrus*, 624 F.3d at 863; *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force").

right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez*, 578 F.3d at 540. To be clearly established at the time, "the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right ... and existing precedent must have placed the statutory or constitutional question beyond debate." *Chasensky v. Walker*, 740 F.3d 1088, 1094 (7th Cir. 2014). Qualified immunity both "affords enhanced deference to officers' on-scene judgments about the level of necessary force," *Abbott*, 705 F.3d at 725, and "provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Wheeler*, 539 F.3d at 639.

It was clearly established that "a police officer's use of force in arresting a suspect violates the Constitution if ... the officer used greater force than was reasonably necessary to make the arrest." *Lester*, 830 F.2d at 713. But "[o]ur inquiry ... requires a higher level of specificity," *Jones by Jones v. Webb*, 45 F.3d 178, 184 (7th Cir. 1995), and it was not clearly established in 2017 that "bodying-up" to a person suspected of engaging in disorderly conduct was an unreasonable use of force in violation of the Fourth Amendment. *See Reher,* 656 F.3d at 777. Glickman's complaint does not depict facts and circumstances that establish it was "beyond debate" that the use of force was unreasonable. *Chasensky*, 740 F.3d at 1094. Glickman's claim of

unreasonable force during the encounter in Austin Park is dismissed without prejudice.[8]

Atto and Walsh's encounter with Glickman outside of his house barely implicated the Fourth Amendment at all. Atto and Walsh were free to approach Glickman and ask him questions. *United States v. Drayton*, 536 U.S. 194, 195 (2002); *United States v. Breland*, 356 F.3d 787, 791 (7th Cir. 2004). Glickman has not alleged facts that suggest conduct so coercive that a reasonable person would not have felt free to decline the requests and terminate the encounter. All he says is that Atto and Walsh "interrogated" him and "demanded to see his cell phone." *See* [7] ¶¶ 27–28. He declined their requests and terminated the encounter. Neither a search nor a seizure occurred. Any Fourth Amendment claim about the encounter outside of Glickman's house is dismissed with prejudice.

That brings us to the station house. By the time Atto and Walsh arrested Glickman at police headquarters, *see* [7] ¶¶ 31–32, they were aware of more facts that substantiated the allegations that Glickman was committing disorderly conduct. For instance, they had learned that Glickman had repeatedly refused requests to keep his distance from the campers, had allowed his dog to separate one of the campers from the group, had touched the campers, called them by their names and asked questions about their medical conditions, and been taking pictures of two girls shortly

---

[8] Although it seems unlikely that Glickman can allege facts about the use of force that change the qualified immunity analysis, it is not obvious that amendment would be futile.

before the police arrived. [25-2] at ¶ 28–29.[9] *Bridewell*, 730 F.3d at 675; 720 Ill. Comp. Stat. Ann. 5/26-1; *Reher*, 656 F.3d at 777. This is similar to the type of information sufficient for probable cause in *Reher*, 656 F.3d at 777, and it gave Atto and Walsh probable cause to arrest Glickman upon his arrival at the station house.

Glickman has failed to allege that Atto and Walsh used unreasonable force during this arrest, too. He was handcuffed, forced to remove his shoelaces and then let out a doorway through the garage area. [7] ¶¶ 33–34, 37. The handcuffs were necessary to make the arrest, *Graham*, 490 U.S. at 396, and there has been no allegation that they were used with unnecessary force or in a way that harmed Glickman. *Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (force that is measured, brief, and appropriate to accomplish the purposes of the investigatory stop is reasonable). Forcing Glickman to remove his shoelaces was reasonable, too, in light of the potential that he use them to harm himself or others. *See State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir. 1983) (guards not guilty of Eighth Amendment violation for deliberate indifference when inmate hung himself in part because they took precautions to protect against his suicide, such as removing his belt and shoelaces). And it is a stretch to suggest that it was a "use of force" to require

---

[9] Glickman asserts that these allegations are "totally unfounded" and that, if accurate, Glickman "would have been engaging in criminal conduct much worst [sic] than a 'disorderly persons' offense." [28] at 15. He also says that the defendants "fail to indicate when they came into possession of this absurd allegation" and that it is a "total fabrication." *Id.* at 15–16. But the source of these allegations is not the defendants—it is Glickman. In his suit against the camp, Glickman alleges that staff from Maine-Niles told Walsh each of these things after Walsh returned from Glickman's house, [25-2] at ¶¶ 28–29. Glickman alleges that the accusations were false, but does not allege that they were not made. Police officers may rely on accusations from witnesses to establish probable cause, even if those accusations end up being false.

that Glickman exit the station house through a different door than the one he entered, but in any event it was not unreasonable.

Nor were the other harms visited upon Glickman during his station house arrest unreasonable uses of force. There is sparse authority for the proposition that unreasonable uses of force include nonphysical encounters. *See Wilkins v. May,* 872 F.2d 190, 194 (7th Cir. 1989) ("[w]here the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution"). *But see Jacobs v. City of Chicago*, 215 F.3d 758, 773–774 (7th Cir. 2000) (affirming viability of excessive force claim where defendant officer continued to point a gun at the plaintiff even after ascertaining that the plaintiff was not the person he was looking for). Even if such a nonphysical display implicated a Fourth Amendment unreasonable-use-of-force claim, the actions taken here are not enough. But since it is conceivable that Glickman could allege additional facts concerning the use of force, this part of the Fourth Amendment claim is dismissed without prejudice.

Glickman's Fourth Amendment claims are dismissed in their entirety, but without prejudice in part as to unreasonable use of force.

### 3.    *First Amendment*

Atto and Walsh move to dismiss Glickman's First Amendment claim on the basis of qualified immunity. [25] at 14. It was not clearly established in 2017 that a defendant's First Amendment rights would be violated if an officer (even one harboring retaliatory intent) had probable cause to arrest a defendant and then

arrested that defendant. *Thayer*, 705 F.3d at 253; *see also Lozman v. City of Riviera Beach, Fla.*, – U.S. –, 138 S. Ct. 1945, 1954 (2018) (whether probable cause defeats a typical retaliatory arrest claim is a question that awaits a different case). Nor was it clearly established that a retaliatory *Terry* stop supported by reasonable suspicion violated the First Amendment. Atto and Walsh had reasonable suspicion in Austin Park and probable cause when they arrested Glickman at the station house, so they are entitled to qualified immunity insofar as Glickman's First Amendment claim addresses those encounters.[10] Glickman's claims are dismissed with prejudice.[11]

But that is not the final word on Glickman's constitutional claims. He also alleges that Atto and Walsh retaliated against him for saying he was going to file a complaint, and that they did so by (among other things) issuing baseless citations and broadcasting false information on the police blotter. *See, e.g.*, [7] ¶ 35 ("[i]n further retaliation against Plaintiff for indicating he was going to file a harassment complaint against them" Atto and Walsh issued Glickman a baseless summons). To make out a prima facie case for First Amendment retaliation, Glickman must show that "(1) [he] engaged in activity protected by the First Amendment; (2) [he] suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment

---

[10] Glickman's complaint also does not allege that Atto and Walsh acted with retaliatory intent at the park or when arresting him at the station house. See [7] ¶¶ 23–26; *Thayer*, 705 F.3d at 253 (dismissing a First Amendment retaliation claim in part because the "record is void of evidence showing that the officers acted with retaliatory animus in arresting him"). Glickman has limited his allegations about the officers' intent to the conduct that took place after Glickman was arrested at the station house. See [7] ¶¶ 34–39.

[11] "Even though dismissal under Rule 12(b)(6) on qualified immunity grounds may be inappropriate in many cases, in some cases it is proper." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 916 (7th Cir. 2015) (citations omitted).

activity was at least a motivating factor in the police officer's decision." *Thayer*, 705 F.3d at 251. Atto and Walsh do not address this claim at all. *See* [25]; [34]. That portion of Glickman's First Amendment retaliation claim survives.

### 4. Monell *Claims Against Morton Grove*

Glickman's complaint advances two claims against the Village of Morton Grove under § 1983. [7] ¶¶ 44–46. A municipality like Morton Grove can be liable under § 1983 only if "its officers acted pursuant to: (1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012); *Monell*, 436 U.S. at 690. Such a policy, practice or custom must have been the "moving force behind the plaintiff's constitutional injury." *Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 674 (7th Cir. 2009).

Count II of the complaint alleges that Morton Grove failed to "properly train, supervise, or discipline" Atto and Walsh, and, by doing so, Morton Grove caused the violation of Glickman's rights under § 1983. [7] ¶¶ 44–46. It makes no mention of an official policy, nor a widespread and well settled practice or custom, nor any action by a city official. *See id.* Failure to train can be a theory of *Monell* liability, but there must be some fact alleged that suggests a practice beyond a single incident of failed supervision of the named defendants.

Count III alleges that, by acting "through" Atto and Walsh, and via other "de facto policies, practices, customs and usages," Morton Grove caused "unconstitutional

conduct." [7] ¶¶ 49–50. But Glickman is required to "'plead[ ] factual content that allows the court to draw the reasonable inference' that the [Village] maintained a policy, custom, or practice" that caused a constitutional violation. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). Instead, he listed the legal elements of a *Monell* claim. *See* [7] ¶¶ 49–50. Those paragraphs of his complaint do not contain "factual allegations and as such contribute nothing to the plausibility analysis under *Twombly/Iqbal*." *McCauley,* 671 F.3d at 616. Nor are there factual allegations anywhere else in his complaint that advance his *Monell* claims. Those claims are both dismissed without prejudice.

### C. State-Law Claims

Glickman alleges that Morton Grove was negligent when it hired Atto and Walsh, [7] ¶¶ 55–57, and that both the officers (and Morton Grove, via *respondeat superior*) are liable for state-law tort claims. [7] ¶¶ 52–54, 58–60. But for Glickman's remaining First Amendment retaliation claim against Atto and Walsh, his state-law claims would be dismissed for want of federal jurisdiction. *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 483 (7th Cir. 2017). But that claim survives.

Glickman's false arrest and false imprisonment claims are insufficient. The "essential elements" for false arrest and false imprisonment claims are (1) that "the plaintiff was restrained or arrested by the defendant," and (2) that "the defendant acted without having reasonable grounds to believe that an offense was committed by the plaintiff." *Meerbrey v. Marshall Field & Co.*, 139 Ill.2d 455, 474 (1990). The existence of probable cause is "an absolute bar" to both claims for false arrest,

*Friedman v. Vill. of Skokie*, 763 F.2d 236, 239 (7th Cir. 1985), and claims for false imprisonment. *See Terket v. Lund,* 623 F.2d 29, 31 (7th Cir. 1980).

Atto and Walsh had probable cause to arrest Glickman by the time he arrived at the station house, so Glickman's state-law claim for false arrest and false imprisonment fails, and if the Illinois Supreme Court were to be presented with the issue, it would find that an investigatory stop justified by reasonable suspicion cannot form the basis of a false arrest or false imprisonment claim, either. *See Ramos v. City of Chicago,* 716 F.3d 1013, 1016 (7th Cir. 2013) (upholding district court's dismissal of claim for false arrest where the district court held that "the brief detention of [plaintiff] while investigating the situation was not an arrest, but rather was an investigatory stop that … is permissible as long as the officers have reasonable suspicion that criminal activity is ongoing"). Glickman's false arrest and false imprisonment claims are dismissed with prejudice because the allegations in his complaints establish justification for the arrest.

Under Illinois law, "[a] person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 Ill. Comp. Stat. Ann. 5/12-1. Similarly, "[a] person commits a battery if he intentionally or knowingly without legal justification causes bodily harm to an individual [citation omitted] or makes physical contact of an insulting or provoking nature with an individual." *People v. Villareal*, 114 Ill.App.3d 389, 395 (2nd Dist. 1983). As discussed, Atto and Walsh had lawful authority to arrest Glickman at the station house. They also had lawful authority to

conduct a *Terry* stop with reasonable force in Austin Park. Those claims are both dismissed without prejudice, because if Glickman is able to allege facts that demonstrate unreasonable use of force, he may be able to state a claim for assault or battery.

In order to state a claim for malicious prosecution, Glickman must allege "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996). Glickman's claim does include an allegation of malice, [7] ¶ 43, and Glickman has sufficiently alleged that the criminal complaint was terminated in a manner indicative of his innocence. *See* [7] ¶ 39. It is more than a "technicality" when the information on the complaint fails to show that the defendant has committed the charged conduct. But Atto and Walsh had reasonable grounds to believe that Glickman had committed disorderly conduct, and "a mistake or error that is not grossly negligent will not affect the question of probable cause in an action for malicious prosecution when there is an honest belief by the complainant that the accused is probably guilty of the offense." *Johnson v. Target Stores, Inc.*, 341 Ill.App.3d 56, 72 (1st Dist. 2003). As discussed, Glickman's complaints establish probable cause to believe he committed disorderly conduct, so Glickman's claim for malicious prosecution is dismissed with prejudice.

"The only elements necessary to plead a cause of action for abuse of process are: (1) the existence of an ulterior purpose or motive and (2) some act in the use of legal process not proper in the regular prosecution of the proceedings." *Kumar v. Bornstein*, 354 Ill.App.3d 159, 166 (2nd Dist. 2004). The second element is the "gravamen of the offense," and in order to satisfy it, the plaintiff must "plead facts that … the process was used to accomplish some result that is beyond the purview of the process," *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill.App.3d 177, 183 (2nd Dist. 2003), "or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do." *Cartwright v. Wexler, Wexler & Heller, Ltd.*, 53 Ill.App.3d 983, 986 (1st Dist. 1977). "When process is used only for its intended purpose, there has been no misapplication of process," even if the process was used by someone with an immoral motive. *Id.* Actions for abuse of process are disfavored, and the elements are strictly construed. *Erlich v. Lopin-Erlich*, 195 Ill.App.3d 537, 539 (5th Dist. 1990).

Glickman has alleged an act sufficient to state a claim for abuse of process—an actual arrest, *Neurosurgery*, 339 Ill.App.3d at 184—but has failed to allege that that process was used for something other than its intended purpose (i.e., to apprehend a suspected criminal or investigate suspected criminal activity), and his complaint is vague at best about Atto's and Walsh's ulterior motives. *See, e.g.,* [7] ¶ 43 (alleging only that all of Atto's and Walsh's "actions and/or omissions" were performed "maliciously" and "intentionally"). Glickman's briefing clarifies that he thinks Atto and Walsh arrested him in order to retaliate against him for filing a police complaint,

[28] at 28–29, but that allegation is not clear from the face of the complaint. *See* [7]. "Although a plaintiff may assert additional facts in a motion to defeat dismissal, he or she cannot amend his or her complaint to state new claims in such a motion." *Dart*, 803 F.3d at 311. Glickman's claim for abuse of process is dismissed without prejudice.

In order to state a claim for intentional infliction of emotional distress, Glickman must show that "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010). "Extreme and outrageous behavior requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage." *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 36. Such conduct can "arise from the defendant's abuse of some position which gives him actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests." *Id*. But "[w]hen a defendant in an action for emotional distress is accused of improperly using a position of power or authority, courts view this allegation in conjunction with another significant consideration: whether the defendant reasonably believed that his objective was legitimate." *McGrath v. Fahey*, 126 Ill.2d 78, 88 (1988). And the law will "intervene[] only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 276 (2003).

The complaint alleges that Atto and Walsh had reasonable grounds to believe that their objectives were legitimate. "Although the reasonable belief that his objective is legitimate does not provide a defendant carte blanche to pursue that objective by outrageous means [citation omitted], it is a substantial factor in evaluating the outrageousness of his conduct." *McGrath*, 126 Ill.2d at 276. Atto and Walsh were justified in stopping Glickman in Austin Park and in arresting him at the station house, and, as alleged, used reasonable force so they did not act outrageously. Glickman's claim for intentional infliction of emotional distress is dismissed without prejudice.

Lastly, Glickman's claim for negligent infliction of emotional distress is barred by Illinois's statute regarding immunity for public employees. 745 Ill. Comp. Stat. Ann. 10/2-202. That section "immunizes liability for negligence." *Barnett v. Zion Park Dist.*, 171 Ill.2d 378, 390 (1996). That claim is dismissed with prejudice.

With regards to Glickman's state-law claims against Morton Grove, defendants are right that Glickman's state-law *respondeat superior* claim against Morton Grove is "entirely derivative" of Glickman's remaining state-law claims against Atto and Walsh. *Moy v. Cty. of Cook*, 159 Ill.2d 519, 524 (1994). The claims against Morton Grove are dismissed without prejudice; if Glickman files an amended complaint that states a claim against Atto and Walsh for a state-law violation, he may be able to state a claim against Morton Grove under a *respondeat superior* theory, too.

Lastly, in order to succeed on a claim for negligent hiring, Glickman must show that Morton Grove "(1) … knew or should have known that [Atto and Walsh] had a

particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of [their] hiring or retention; and (3) that this particular unfitness proximately caused the [Glickman's] injury." *Van Horne v. Muller*, 185 Ill.2d 299, 311 (1998). Nowhere has Glickman alleged that Morton Grove knew or should have known that Atto and Walsh were unfit for their positions when they hired them. [7] ¶¶ 55–57. Moreover, "[t]he decision to hire or not to hire a police officer is an inherently discretionary act and, thus, is subject to the immunities contained in the Immunity Act." *Johnson v. Mers*, 279 Ill.App.3d 372, 380 (2nd Dist. 1996). Glickman's claim for negligent hiring, training and supervision against Morton Grove is dismissed without prejudice.

## IV. Conclusion

Defendants' motion to dismiss is granted in part, denied in part. Count I may proceed insofar as it alleges that Atto and Walsh violated Glickman's First Amendment rights after arresting him at the station house. Glickman's remaining claims against Atto and Walsh under § 1983 are dismissed with prejudice in part and without prejudice in part. Glickman's *Monell* claims against Morton Grove (Counts II and III) are dismissed without prejudice, and his state-law claims against Atto and Walsh (Count VI) are dismissed with prejudice in part and without prejudice in part. Lastly, Glickman's claims against Morton Grove for negligent hiring (Count V) and *respondeat superior* (Count IV) are dismissed without prejudice. Glickman may file an amended complaint to replead the claims dismissed without prejudice by May 13, 2019. If no amended complaint is filed, the dismissals will convert to dismissals with prejudice, and the case will proceed solely on the surviving First Amendment claim. A status hearing is set for May 17, 2019, at 9:30 a.m.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: April 19, 2019